# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DEVONTE CAMPBELL, | ) | CASE NO. 1:15-cv-01302 |
| | ) | |
| Petitioner, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| ALAN J. LAZAROFF, Warden | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This 28 U.S.C. § 2254 petition is before the magistrate judge pursuant to Local Rule 72.2(b)(2).  Before the court is the petition of Devonte Campbell ("Campbell" or "Petitioner"), for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  (Doc. No. 1.)  Petitioner is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case of *State of Ohio vs. Campbell*, Cuyahoga County Case No. CR-12-563469-A.  For the following reasons, the magistrate judge recommends that the petition be DENIED.

## I.  Background

During its May 2012 term, a Cuyahoga County grand jury charged Campbell with two counts of attempted murder in violation of Ohio Revised Code ("O.R.C.") §§ 2923.02 & 2903.02(A); two counts of felonious assault in violation of § 2903.11(A)(1); two counts of felonious assault in violation of § 2903.11(A)(2); one count of carrying a concealed weapon in violation of O.R.C. § 2923.12(A)(2); one count of having a weapon under disability in violation of O.R.C. § 2923.13(A)(3); one count of illegal

possession of a firearm in a liquor permit premises in violation of O.R.C. § 2923.121(A);

and, one count of improperly handling firearms in a motor vehicle in violation of O.R.C.

§ 2923.16(B).  (Doc. No. 9-1, Exh. 1.)  All charges carried firearm and/or forfeiture

specifications.  (*Id*.)  Campbell pled not guilty. (Exhibit 2).

The state appellate court that affirmed Petitioner's conviction noted the following

relevant facts:

> [*P3]  Rodney Williams testified at trial that he met his cousin, Otez
> Hutson, at the Olive Twist bar in Euclid on the evening of September 14,
> 2011.  Williams said that a tall light-skinned male with tattoos bumped him
> when he was on the dance floor, causing him to spill his drink, and
> Williams and Hutson argued with this male and the male's friends until
> security broke up the argument.  After Hutson left the bar, Williams got
> another drink and went back to the dance floor. A short time later, he saw
> Irshad Malone, a friend of Hutson's, arguing with some of the same males
> they had argued with earlier.  Williams saw security personnel go over to
> break up the argument and then "everything just got blurry."  Upon
> realizing that he had been shot in the stomach, Williams walked out of the
> bar, sat down, and waited for an ambulance. Williams testified that he did
> not see who shot him.
>
> [*P4]  Irshad Malone testified that at approximately 11:30 p.m. on
> September 14, 2011, he, his brother Nemon Hobbs, and his cousin Alan
> Burke, pulled in the parking lot of the Olive Twist and parked in the
> second row facing the door. As they were sitting in their car smoking and
> drinking, an SUV pulled up on their left and parked next to them.  Malone
> saw a man and woman get out of the SUV and walk to the door of the bar;
> he then saw the male come back to the SUV, put a bulletproof vest in the
> vehicle, and go back in the bar.
>
> [*P5]  Malone, Hobbs, and Burke eventually went in the bar, where
> Malone saw his friend "Tez," who introduced him to Williams.  Later, when
> Tez left the bar, he told Malone to "make sure my cousin [*i.e.*, Williams]
> cool."  Malone testified that he later saw Williams arguing with several
> males, so he went over and told everyone to "just let it be."  The
> individuals separated, and Malone thought the incident was over, but
> approximately 15 minutes later, he heard a gunshot.  Malone ran out of
> the bar to his car and was trying to open the driver's side door when he
> was shot in the back.  He testified that the shot spun his body around 180
> degrees so he was facing the SUV that was parked next to him.  Malone

2

said that Campbell was sitting in the rear passenger seat closest to him, and the window was down.  As the SUV pulled away, Malone saw Campbell looking at him with a "weird" smile.

[*P6]  Nemon Hobbs testified that Malone was ahead of him as they ran to their car after hearing the gunshot in the bar.  Hobbs said that he saw Campbell and several other people running to the SUV that was parked next to their car, and saw Campbell get in the back seat.  Hobbs testified that as Malone was trying to get in the driver's seat of their car, he saw a hand with a gun come out of the open window on the passenger side of the SUV; he then saw a flash, heard a shot, and saw Malone "flip around the car."  Hobbs acknowledged that he did not see who shot his brother but testified that he later picked Campbell out of a photo array because he recognized him as the male with the bulletproof vest who was involved in the altercation in the bar and who Hobbs saw running to the SUV moments before his brother was shot.

[*P7]  Alan Burke testified that as he sat in the car with Malone and Hobbs before going in to the Olive Twist that evening, he saw Campbell walk back to the SUV that was parked next to them, take off his bulletproof vest, put it in the car, and walk back into the bar.  Ten minutes later, Burke saw a female walk to the SUV, open the back door, close it, and then go back into the bar. Burke testified that the male who returned the vest to the SUV had dreadlocks and that he stood out in the bar that evening because only one or two other people in the bar had dreadlocks.

[*P8]  Benjamin Sims, who was working security on the dance floor at the Olive Twist the evening of September 14, 2011, testified that it seemed as if two groups of males were "at each other" throughout the night.  He said that he broke up an argument and ejected some males but they somehow got back in the bar.  Sims said that later, as he stood near the dance floor, he saw one of those males, who was only three or four feet away from him, reach down towards his waist, pull a pistol out, and pull the trigger. Sims then heard a shot.

[*P9]  Later that evening, Sims reviewed surveillance tape from the bar with Terry Howell, the owner of the Olive Twist; Larry Jackson, who was also working security at the bar that night; and several Cleveland police officers; and pointed out the male who had fired the shot. The tape was played in court during Sims's testimony without any defense objection, and Sims identified a male with a plaid shirt on as the person he saw fire the gun.

[*P10]  Larry Jackson, who was working security at the door on September 14, 2011, testified that he patted down a male who was

3

wearing a bulletproof vest and told him that he could not wear the vest in the bar. After putting the vest in his car, the male returned to the bar. Jackson said that he intervened in several altercations involving the same male that evening, and at one point, he put the male up against the wall and told him to calm down or he would be ejected.

[*P11]  Jackson testified that he reviewed surveillance tapes after the shootings and identified the male with the bulletproof vest in the video. In court, over defense counsel's objection, Jackson identified a male wearing a plaid shirt — the same male Sims had pointed out in the videotape — as the male with the bulletproof vest who was involved in the altercations in the bar that evening.  Jackson also identified Campbell in court as the individual he recognized on the videotape.

[*P12]  Cleveland police responded to the shootings at the Olive Twist and recovered two .40 caliber bullet casings, one from the dance floor and another from the parking lot.  The police also spoke with Hobbs and Burke at Hillcrest Hospital later that evening and observed a bullet hole in the driver's side door of the car of the car that Malone, Hobbs, and Burke had been using that night.

[*P13]  Terry Howell, the owner of the Olive Twist, testified that he called the police on December 2, 2011, because the male that Sims had identified as the shooter from the September 14, 2011 surveillance video had tried to enter the bar that evening with several other males but had been turned away.  Howell told the police that the male was wearing an orange polo shirt and gave them the license plate number of the vehicle he was in.

[*P14]  According to Thomas Coyne, a Euclid police officer, a police chase ensued and the suspect vehicle eventually flipped over and crashed. Campbell, who was wearing an orange polo shirt, was ejected from the vehicle, as was another passenger; a third occupant was found in the car. The police found two guns on the roof of the flipped vehicle.  Mike Roberts, a forensic scientist at the Bureau of Criminal Investigation, testified that the two fired casings found at the Olive Twist on September 14, 2011, were fired from one of the guns recovered from the vehicle.

[*P15]  Months after this incident, Cleveland police detective Mitch Houser took over the investigation.  At his direction, the police separately showed Hobbs and Malone different photo arrays, and they both identified Campbell as the male they recognized from the Olive Twist  on September 14, 2011.

*State v. Campbell*, 2014-Ohio-493 at ¶¶3-15, 2014 Ohio App. LEXIS 486 (Ohio Ct.

App., Feb. 13, 2014).

## II.  Procedural History

**A.    Trial Court Proceedings**

Prior to trial, on February 11, 2013, Campbell filed a motion seeking to *voir dire* the identification witnesses arguing that it was the "only possible means to move [the court] to suppress any tainted testimony from trial without risk of prejudice to the jury." (Doc. No. 9-1, Exh. 4.)  After hearing oral argument and reviewing the photo arrays, the trial court denied the motion to suppress.  (Doc. No. 9-3, Vol. II, Tr. 160-168.)  The trial court concluded: "[T]he identifying witnesses did not identify the defendant under circumstances that were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Id*. at Tr. 168.)

Prior to closing arguments, the court granted Campbell's Rule 29 motion to dismiss with respect to the illegal possession of a firearm in a liquor permit premises charge.  (Doc. No. 9-1, Exh. 6.)  On February 28, 2013, the jury found Campbell guilty of all remaining counts, save for the weapon while under a disability charge that was tried by the court.[1]  (Doc. No. 9-1, Exh. 7.)  The court found him guilty of that charge as well. (*Id*.)

On March 25, 2013, the court sentenced Campbell to an aggregate prison term of 24 years.  (Doc. No. 9-1, Exh. 8.)

**B.    Direct Appeal**

On April 22, 2013, Campbell, through counsel, filed a Notice of Appeal with the

---

[1]  Campbell had elected to have the weapon while under a disability charge tried by the court rather than a jury.  (Doc. No. 9-1, Exh. 5.)

Eighth District Court of Appeals ("state appellate court").  (Doc. No. 9-1, Exh. 9.)

Campbell, through new counsel, raised the following assignments of error:

1.    Appellant was denied due process when the trial court denied appellant's motion to suppress identification testimony.

2.    The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the State failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

3.    Appellant's convictions are against the manifest weight of the evidence.

4.    Appellant's rights were violated when the trial court prevented him from cross-examining Officer Tom Coyne on statements contained on the police report.

5.    The trial court erred by allowing the State to introduce and play portions of the video surveillance during appellant's trial.

6.    The trial court committed reversible error in instructing the jury as to constructive possession whine that instruction was not warranted buy the evidence.

7.    The trial court erred by not calculating appellant's jail-time credit in this case.

(Doc. No. 9-1, Exhibit 10.)  On February 13, 2014, the state appellate court affirmed

Campbell's conviction and sentence, but remanded for the trial court to issue a *nunc*

*pro tunc* sentencing entry crediting Campbell with 363 days jail-time credit.[2]  (Doc. No.

9-1, Exh. 12.)

On May 31, 2014, Campbell, represented by counsel, filed a notice of appeal

with the Ohio Supreme Court.  (Doc. No. 9-1, Exh. 14.)  In his memorandum in support

_____

[2]  On July 24, 2014, the trial court issued a *nunc pro tunc* entry complying the state appellate court's remand order.  (Doc. No. 9-1, Exh. 13.)

6

of jurisdiction, Campbell set forth the following propositions of law:

I.     The Defendant's pretrial motion to *voir dire* identification witnesses (treated as a motion to suppress the photo lineup at trial) sufficiently preserved the issue of whether the photo lineup had been conducted in compliance with Revised Code 2933.83 for consideration by the Court of Appeals, regardless of whether police compliance with the statute was specifically raised by the Defendant's trial counsel.

II.     Once noncompliance of the statute is demonstrated, the remedy should be suppression of the tainted evidence, as opposed to a jury instruction as to the proved failure of the police investigation.

III.     Failure to properly raise and preserve statutorily mandated evidentiary challenges of the photo lineup by the defense constitutes ineffective assistance of counsel.

(Doc. No. 9-1, Exh. 15.)  On June 25, 2014, the Ohio Supreme Court declined to accept

jurisdiction of the appeal pursuant to S. Ct. Prac.R. 7.08(B)(4).  (Doc. No. 9-1, Exh. 16.)

### III.   Proceedings in this Court

On June 30, 2015, Petitioner, represented by counsel, filed his § 2254 petition.[3]

(Doc. No. 1.)  He asserted the following sole ground for relief:

**GROUND ONE**: An impermissibly suggestive photo array violated Mr. Campbell's due process rights.

***Supporting Facts***: Mr. Campbell was not identified as the individual responsible for the September 14, 2011 shooting until several months later.  Mr. Campbell claims, as he did to the State courts, that he has been misidentified as the shooter as the result of an unduly suggestive photo array in violation of his constitutional right.

(Doc. No. 1.)

---

[3]  On November 2, 2015, the Court granted counsel's motion to withdraw.  (Doc. Nos. 12 & 13.)  The Court denied Petitioner's subsequent motion for appointment of counsel (Doc. Nos. 14 & 15), as well as motion for reconsideration of the denial.  (Doc. Nos. 16 & 17.)

7

## IV. Procedural Issues

**A.    Jurisdiction**

A state prisoner may file a § 2254 petition in "the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him." 28 U.S.C. § 2241(d).  The Court of Common Pleas of Cuyahoga County, Ohio sentenced Petitioner.  (Doc. No. 9-1, Exh. 8.)  Cuyahoga County is within this Court's geographic jurisdiction.  *See* 28 U.S.C. § 115(a).  Accordingly, this Court has jurisdiction over Petitioner's § 2254 petition.

**B.    Exhaustion and Procedural Default**

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus.  *See* 28 U.S.C. § 2254(b) and (c); *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991).  If any state procedures for relief remain available, the petitioner has not exhausted his state remedies, and a federal court must dismiss his petition.  *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims.  *See Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).  Fair presentment of a claim in a federal constitutional context requires a petitioner to apprise the state courts that his claim is a federal claim, rather than "merely . . . an issue arising under state law."  *Koontz v. Glossa*, 731 F.2d

8

365, 368 (6th Cir. 1984).

Similarly, a federal court may not review  "contentions of federal law . . .  not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure."  Wainwright v. Sykes, 433 U.S. 72, 87 (1977). When a petitioner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991).

If the State argues that a petitioner has procedurally defaulted, the Court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction.  . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. . . . [Fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986).

9

The Respondent asserts that Campbell's sole claim for habeas relief is procedurally defaulted because it was not fairly presented to the Supreme Court of Ohio as a distinct federal constitutional claim.  (Doc. No. 9 at pp. 13-14.)  Specifically, Respondent concedes that, before the state appellate court, Campbell challenged the pretrial identifications on due process grounds, but abandoned such an argument in his appeal before the Ohio Supreme Court.  (*Id*.)

Respondent is correct that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-848 (1999) (finding that while Boerckel raised three constitutional claims before the appellate court, his failure to raise them before the state's supreme court resulted in a procedural default); *accord Steele v. Tibbals*, 2016 U.S. Dist. LEXIS 59211 at *10 (S.D. Ohio, May 4, 2016) ("Failure to present an issue to the state supreme court on discretionary review constitutes procedural default,"); *Beck v. Warden, Chillicothe Corr. Inst.*, 2016 U.S. Dist. LEXIS 45597 at *12 (S.D. Ohio Apr. 4, 2016) ("A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.")  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Landrum v. Mitchell*, 625 F.3d 905, 918 (6th Cir. 2010) (*quoting Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted)).

Therefore, whether Campbell's claim is defaulted hinges on whether he fairly presented the substance of his federal constitutional claim to the Supreme Court of

10

Ohio in addition to raising it before the state appellate court. A claim is "fairly presented" where the petitioner "asserted both the factual and legal basis for his claim to the state courts." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citations omitted). In *Beach v. Moore*, the Sixth Circuit Court of Appeals observed that a petitioner can "fairly present" his claim to the state courts in one of four ways:

> (1) reliance upon federal cases employing constitutional analysis;
>
> (2) reliance upon state cases employing federal constitutional analysis;
>
> (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or
>
> (4) alleging facts well within the mainstream of constitutional law.

343 Fed. App'x 7, 10-11 (6th Cir. 2009) (quoting *Whiting v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005)).

Petitioner's brief before the state appellate court fails every method of the Sixth Circuit's test to adequately raise a deprivation of a fundamentally fair trial under federal law. A careful reading of Petitioner's brief memorandum before the Ohio Supreme Court reveals that Petitioner was not arguing that the state courts' failure to exclude the photo array violated *Biggers*, but rather that O.R.C. § 2933 .83 supplanted the first element of the *Biggers* test and that the state courts failed to comply with the mandates of the statute. (Doc. No. 9-1, Exh. 15 at pp. 9-13.) Thus, while Campbell's memorandum cites federal cases employing a constitutional analysis, including *Biggers* and *Manson*, he argues that a statutory rather than a federal constitutional error occurred. (*Id*.) Therefore, the Court finds that Petitioner's sole ground for relief is defaulted for lack of fair presentation before the state's highest court. Further,

11

Campbell does not show cause and prejudice for his default or demonstrate that a fundamental miscarriage of justice would result if the default is enforced.  For these reasons, it is recommended that Petitioner's sole ground for relief should be dismissed as defaulted for lack of fair presentation.

Nevertheless, in an abundance of caution, the Court will alternatively address the merits of Campbell's claim below to the extent it asserts a violation of clearly established federal law.

## V.  The Merits of Petitioner's Claims

### A.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ( "AEDPA") altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus.  As amended, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A writ of habeas corpus may issue only if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence.  *See* *Carey v. Musladin*, 549 U.S. 70 (2006); *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000).  Law is "clearly established" only by holdings of the

Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction.  *See Carey*, 549 U.S. at 74.

Courts must give independent meaning to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1):

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 404-05 (emphasis added by the quoting court).  A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result.  *Id.* at 405-06.  A decision involves an unreasonable application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to the facts of the case at hand.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been objectively unreasonable."  *Id.* at 520-21 (internal citations and quotation marks omitted).

13

## B.    Ground One: Identification

Petitioner argues in his sole ground for relief that the trial court erred in failing to suppress the results of an unduly suggestive photo identification, thus violating his right to due process.  (Doc. No. 1-1 at pp. 7-10.)  Respondent denies that the photo array used to identify Campbell was unduly suggestive.[4]  (Doc. No. 9.)

Introducing into evidence the results of an unduly suggestive police identification procedure may violate a defendant's right to due process and require a trial court to suppress that evidence.  *See Foster v. California,* 394 U.S. 440 (1969) (finding that due process required the exclusion of an eyewitness identification obtained through a procedure making identification of the defendant inevitable).  Due process concerns arise, however, only when (1) the identification procedure is arranged by law enforcement officials, (2) the procedure is unnecessarily suggestive, and (3) the procedure creates a substantial likelihood of misidentification.  *See Perry v. New Hampshire,* 132 S. Ct. 716, 724 (2012).  Moreover, even when police use an unduly suggestive procedure, due process does not necessarily require the suppression of the

---

[4]  Respondent also contends that to the extent Campbell asserts a violation of O.R.C. § 2933.83, which sets forth the minimum requirements for photo lineup procedures, such a claim is not cognizable.  (Doc. No. 9 at p. 13.)  The Court agrees, as upon habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States – not whether a violation of state law occurred.  *Estelle v. McGuire,* 502 U.S. 62, 68 (1991); *see also Ojile v. Oppy,* 2014 U.S. Dist. LEXIS 166961 at *65 (S.D. Ohio, Dec. 2, 2014) (finding the issue of whether the State's photo identification procedure violated O.R.C. § 2933.83 was "purely a question of state law ... [a]nd this Court is both bound by state court interpretation of state law and unauthorized to grant habeas relief for violations of state law"); *Jones v. Ross Corr. Inst.,* 2011 U.S. Dist. LEXIS 29927 at *35  (S.D. Ohio, May 21, 2011) ("even if Petitioner could show that the State violated the minimum requirements for photo lineups under O.R.C. § 2933.83(B), it is doubtful that such a violation of state law could rise to the level necessary for this Court to provide habeas relief under § 2254").  Therefore, the Court will only address whether the photo array violated federal constitutional law

14

resulting identification.  *Manson v. Brathwaite,* 432 U.S. 98, 112-13 (1977).  "Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed.  Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury."  *Perry,* 132 S. Ct. at 719 (citations omitted).

In the Sixth Circuit, courts use a two-step analysis to decide whether a photo identification has an unacceptable risk of misidentification.  *Ledbetter v. Edwards,* 35 F.3d 1062, 1070-71 (6ᵗʰ Cir. 1994).  The first step requires the court to determine whether the photo identification was unduly suggestive.  *Id.* ("The defendant bears the burden of proving this element.")  In making this determination, "the court may consider 'the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves.'" *Id.*  If the court determines that the array was not unduly suggestive, the court need not consider the matter further.  *United States v. Stamper,* 2004 WL 422731 at * 462 (6ᵗʰ Cir. Mar. 3, 2004); *Howard v. Warden, Lebanon Corr. Inst.,* 519 F. App'x 360, 366 (6ᵗʰ Cir. 2013) ("a court should not consider the reliability of eyewitness evidence, *i.e.*, engage in part two of the test, unless the defendant satisfies the requirements of part one by proving that the police employed an unduly suggestive identification procedure").

In the present case, Campbell argues that the photo array by which the witnesses identified him was unduly suggestive because: (1) he was wearing a bright shirt that stood out; (2) he was wearing an orange shirt which is associated with jail clothing; (3) he was facing away from the camera; and, (4) he was the only one with

15

visible tattoos on his neck.  (Doc. No. 1-1.)

The state appellate court reviewing the corresponding assignment of error on

direct appeal identified the correct standard applicable to such claims:

> [*P18]  In his first assignment of error, Campbell contends that he was denied due process when the trial court denied his pretrial motion to suppress Malone and Hobbs's identification from the photo arrays.

> [*P19]  A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8.  Consequently, we give deference to the trial judge's factual findings, but we review the application of law to fact de novo. *Id.*; *see also State v. Davis*, 8th Dist. Cuyahoga No. 83033, 2004-Ohio-1908.

>  [*P20]  In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court held that an identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process.

> [*P21]  In determining the admissibility of challenged identification testimony, a reviewing court applies a two-prong test: (1) did the defendant demonstrate that the identification procedure was unduly suggestive; and if so, (2) whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. *State v. Bryson*, 8th Dist. Cuyahoga No. 98298, 2013-Ohio-934, ¶ 42, citing *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 19.

> [*P22]  A photo array is not unduly suggestive where it contains individuals with features similar to the suspect.  *State v. Jones*, 8th Dist. Cuyahoga No. 85025, 2005-Ohio-2620, ¶15.  "Where the men depicted in the photo array with the defendant all appear relatively similar in age, features, skin tone, facial hair, dress, and photo background, the photo array is not impermissibly suggestive."  *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 69, *citing State v. Jacobs*, 7th Dist. Mahoning No. 99-CA-110, 2002-Ohio-5240, ¶18.

*Campbell*, 2014-Ohio-493 at ¶¶18-22.

The state appellate court ultimately determined that the photo array was not

16

unduly suggestive under the first prong:

> [*P23]  Campbell asserts that the array shown to Malone (state's exhibit No. 44) was unduly suggestive and unreliable because he is wearing a bright shirt in his picture and is the only person pictured with a tattoo. He contends that the array shown to Hobbs (state's exhibit No. 45) was unduly suggestive because he is wearing an orange shirt, the color of jail clothing.

> [*P24]  Upon review of the arrays, we do not find either to be unduly suggestive.  The five other men in the arrays with Campbell all appear relatively similar to him in age, features, skin tone, and facial hair. Furthermore, in exhibit No. 44, although Campbell is wearing a yellow shirt against a blue background, another male is wearing a blue shirt against a yellow background, as bright a contrast as that in Campbell's photo.  In exhibit No. 45, three of the other males are wearing reddish-orange coats or sweatshirts that are very similar in color to the orange shirt worn by Campbell.

> [*P25]  Campbell also argues that the photo arrays should have been suppressed because they did not comply with the requirements of R.C. 2933.83(B) regarding photo lineup identifications.  Campbell did not raise this argument in the trial court, however, and thus has waived it for purposes of appeal. *Jacubenta v. Cadillac Ranch*, 8th Dist. Cuyahoga No. 98750, 2013-Ohio-586, ¶ 18; *Thompson v. Preferred Risk Mut. Ins. Co.*, 32 Ohio St.3d 340, 342, 513 N.E.2d 733 (1987).  Nevertheless, Detective Houser testified at trial that the photo arrays were compiled and presented in accord with the procedures of R.C. 2933.83(B).

>  [*P26]  Because Campbell failed to demonstrate that the photo array procedures were unduly suggestive, the first prong of the *Biggers* test, we need not consider the second prong of the test, *i.e.*, whether the identifications, viewed under the totality of the circumstances, were reliable despite their suggestive nature.  The first assignment of error is overruled.

*Campbell*, 2014-Ohio-493 at ¶¶23-26.

The Court ordered Respondent to furnish the Court with a copy of the two photo arrays.  (Doc. No. 18.)  Respondent's counsel filed a response detailing her efforts to obtain the photo arrays from the clerk's office of both the trial and appellate courts, from the prosecutor, as well as from Campbell's defense counsel.  (Doc. No. 19.)

Respondent asserts that all these efforts were unsuccessful.  (*Id*.)  The absence of the photo arrays from the record, while complicating matters, does not prevent the Court from determining whether they were unduly suggestive.

Pursuant to 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  *See also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012) ("[R]egardless of whether we would reach a different conclusion were we reviewing the case *de novo*, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary.") (*quoting Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001) (applying 28 U.S.C. § 2254(e)(1)); *see also Wood v. Allen*, 558 U.S. 290 (2010) ("a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance").  The state appellate court's factual description of the five other men in both photo arrays noted that they all appeared relatively similar to Campbell in age, features, skin tone, and facial hair.  *Campbell*, 2014-Ohio-493 at ¶¶24.  Notably, Petitioner does not challenge this factual finding and the Court, therefore, presumes it is accurate.[5]

---

[5]  At trial, counsel did not argue that Campbell differed from the other five men in age, features, skin tone, or facial hair.  (Doc. No. 9-3, Vol II, Tr. 162-165.)  Rather, trial counsel also focused on the color of Campbell's shirt and his visible tattoos on his neck.  (*Id*.)  Also, at trial, when eyewitness Hobbs again observed the photo array, he stated that all six individuals were African-American men.  (Doc. No. 9-4, Tr. 408.)

Moreover, while Campbell contends that his orange shirt and tattoos resulted in an unduly suggestive photo lineup, Campbell offers no meaningful explanation as to how the state appellate court's determination of this issue was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  The Sixth Circuit has addressed similar arguments to those presented by Petitioner and rejected them:

> Moreover, the fact that Searcy's clothing does not match the clothing of the other individuals in the photo lineup does not make the lineup unduly suggestive.  *Cf. United States v. Crozier*, 259 F.3d 503, 510 (6ᵗʰ Cir. 2001) (including one color photograph of the defendant in a group of black-and-white photographs was unduly suggestive); *Jells v. Mitchell*, 538 F.3d 478, 511-12 (6ᵗʰ Cir. 2008) (lineup was unduly suggestive when the defendant wore a jail jumpsuit and slippers while the other participants wore street clothes and shoes); *Haliym v. Mitchell*, 492 F.3d 680, 704 (6ᵗʰ Cir. 2007) (lineup was unduly suggestive where defendant was the only participant "bandaged or dressed in prison clothing").

*Searcy v. Berghuis*, 549 Fed. App'x 357, 365 (6ᵗʰ Cir. 2013); *see also Legenzoff v. Steckel*, 564 Fed. App'x 136, 144 (6ᵗʰ Cir. 2014) ("Many cases, however, indicate that a photo array is not suggestive where only the defendant is dressed in clothing or has a personal attribute that is expressly referenced by a witness.") (citations omitted).  Campbell's argument – that he was the only individual wearing an orange shirt and that the color orange is associated with penal institutional clothing – is also insufficient to show a photo lineup was unduly suggestive.  In fact, the Sixth Circuit has held that "a photo of a defendant containing mug shot markers was not unduly suggestive where the other pictures did not contain mug shot markers."  *United States v. Reamey*, 132 Fed. App'x 613, 617 (6ᵗʰ Cir. 2005).  In this Court's view, the fact that a defendant has been arrested while there is no indication that others in the photo array have been

19

arrested is potentially more prejudicial than simply wearing the color orange, irrespective of any alleged association of the color with jailhouse garb.

As to the issue of Campbell being the only individual with visible neck tattoos in the photo array, Respondent contends that one of the witnesses, Irshad Malone, never testified that he even noticed Campbell had a tattoo.  (Doc. No. 9 at n. 7, *citing* Tr. 620-637.)  The Court has reviewed the entirety of Malone's trial testimony and notes the Respondent is correct – at no point does Malone mention that he noticed any tattoos on Campbell.  (Doc. No. 9-5, Tr. 618-670.)  The Court has reviewed the entirety of the other witness who made an identification using a challenged photo array – Nemon Hobbs.  During his testimony, Hobbs also never mentions that he noticed any tattoos on Campbell.  (Doc. 9-4, Tr. 373-438.)  In fact, it is completely unclear from Petitioner's memorandum in support of his petition which witnesses during the investigation phase stated that Campbell had tattoos on his neck.  (Doc. No. 1-1.)  As Petitioner has offered no evidence indicating that either Malone or Hobbs ever informed the police that the suspect had tattoo markings on his neck prior to viewing the photo array, the photo array cannot reasonably be deemed unduly suggestive for including only one individual with visible tattoos.

As the state appellate court's statement of the law is correct and its application of the law was not unreasonable, this court must defer to the state appellate court's finding that Campbell failed to prove the photo array was unduly suggestive.  Because Campbell failed to carry his burden of proof with respect to step one of the analysis, the Court is not required to address whether the identification was reliable.  Nevertheless, assuming *arguendo* that the challenged photo array was unduly suggestive at step one,

the second step of the analysis requires the court to consider whether, under the totality of the circumstances surrounding the identification, the identification was nevertheless reliable.  The factors considered in making this determination include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  *Perry,* 132 S. Ct. at 724 n.5 (*quoting Manson,* 432 U.S. at 114).  Where "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth."  *Perry,* 132 S.Ct. at 720.

Here, it is true that a fair amount of time elapsed between the time of the crime and the pretrial identification.  However, several of the other factors convince the Court that the identification was reliable.  Both witnesses, Hobbs and Malone, had a good opportunity to closely observe Campbell throughout the evening even before the shootings occurred.  As such, their only exposure to Campbell was not isolated or confined to the highly stressful moments immediately after the gunshots were fired inside and directly outside the bar.  Malone testified that he saw Campbell arrive in a car that parked next to the car he was sitting in; he saw Campbell and a woman exit the car and walk towards the entrance of the bar; he observed Campbell return to the car; and finally, when he was shot in the back, he turned around and saw Campbell in the passenger seat in another car very close to him – specifically noting that Campbell was the same person he saw earlier with the bullet proof vest and "in the club the whole night" and the same person he identified in court.   (Doc. No. 9-5, Tr. 623, 628-632,

635.)  He testified that after being shot, he saw Campbell's face and was looking "dead at him," he noted Campbell's dreadlocks and was even close enough to observe Campbell make a "weird" face at him.  (*Id.*)

Hobbs testified to a similar set of observations.  He first noticed Campbell when he arrived in a car that parked right next to the car in which he and Malone were sitting.  (Doc. No. 9-4, Tr. 375-376.)  Hobbs identified Campbell in court, noting Campbell was the same individual he saw walk to the bar entrance only to be turned away for wearing a bulletproof vest.  (*Id.*)  Hobbs noted that he really began paying attention to Campbell when he saw Campbell return to his vehicle with the bulletproof vest.  (*Id.*)  After the shooting inside the club, Hobbs observed Campbell, the same individual he had seen earlier with the bulletproof vest, run to his car.  (Doc. No. 9-4, Tr. 386-387.)  Hobbs further stated that Malone ran outside and was the first to reach their car, which was parked right next to the car Campbell arrived in.  (Doc. No. 9-4, Tr. 383-385.)  Hobbs testified that Campbell wore dreadlocks on the night of the shooting and was 99.9 percent confident in his identification noting that he would "never forget" Campbell's face.  (Doc. No. 9-4, Tr. 408-410.)  Based on the above, the Court finds the indicia of reliability of the witnesses' identifications outweighs any alleged undue suggestiveness contained in the photo array.

In conclusion, as the photo array used to obtain an identification of Campbell was not unduly suggestive, the trial court did not violate his due process rights by admitting the witness identifications as evidence.  Even assuming for the sake of argument that the photo arrays were unduly suggestive, the Court would still find that no due process violation occurred due to the reliability of the identifications.  For this

22

reason, Campbell's sole ground for relief is without merit.

**VI. Conclusion**.

For all the reasons set forth above, the petition should be DENIED.


Date: July 19, 2016                              /s/ Nancy A. Vecchiarelli
                                                United States Magistrate Judge


**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**